CLARK, C. J., and BROWN, J., dissenting.
This action was brought by the plaintiffs to test the validity of an election held in Wake Forest for the purpose of establishing a school district therein and levying a special tax for the support of the same, under Revisal, sec. 4115, which was amended by the Public Laws of 1909, ch. 525, and Public Laws of 1911, ch. 135, sec. 1. It provides that "Special school tax districts may be formed by the county board of education in any county without regard to township lines under the following conditions: Upon a petition of one-fourth of the freeholders within the proposed special school district, indorsed by the county board of education, the board of county commissioners, after thirty days notice at the courthouse door and three public places in the proposed district, shall hold an election to ascertain the will of the people within the proposed special school district whether there shall be levied in such district a special annual tax of not more than 30 cents on the $100 valuation of property and 90 cents on the poll to supplement the public school fund, which may be apportioned to such district by the county board of education, in case such special tax is voted." It is not necessary that we should further refer to the amendments. A petition purporting to be signed by one-fourth of the freeholders of the proposed district was presented to the county board of education and duly indorsed by them, and the board of county commissioners thereupon ordered the election to be held in the district on 15 June, 1912, for the purpose aforesaid. Revisal, sec. 4115, also provides that "in case a majority of the qualified voters at the election is in favor of the tax, the same shall be annually levied and collected in the manner prescribed for the levy and collection of other taxes." *Page 147 
Plaintiffs allege that a sufficient number of freeholders, that is, one-fourth, did not sign the petition for the election, but that the women in the district, and persons who are freeholders but are themselves not residents of the district, were not counted in making up the total of freeholders of the district, and that if they are included, one-fourth of the freeholders within the district did not sign the said petition.
The defendants admit that if the women of the district who (180) own freeholds therein are to be counted in order to make a proper roster of the freeholders, then three-fourths of the freeholders did not sign the petition, without any regard to the freeholders who are nonresidents. They contend, though, that plaintiffs cannot raise the question as to the lack of a sufficient number of qualified signers to the petition, because they are concluded by the indorsement or approval of the county board of education, and the order for the election, which was made by the county commissioners. They also insist that the women should not be counted, as they are not freeholders within the meaning and intendment of the statute.
Plaintiffs further allege that if the election was properly ordered, the question submitted did not receive the approval of a majority of the qualified voters of the district, as required by the statute. It appears that the vote at the election was canvassed by the registrar and poll-holders, who are about to certify the result to the board of county commissioners, who, it is alleged and admitted, will receive the election returns, record the same, and levy the tax as provided by Revisal, sec. 4115.
Plaintiffs prayed that the said election be declared void, set aside and annulled, and, as ancillary to this relief, that defendants be enjoined from declaring the alleged illegal result and from levying the tax.
The court, his Honor, Judge Garand S. Ferguson, presiding, was of the opinion, and so decided, that women and nonresidents who own freeholds in the district should be included in the count, so as to make up the total number of freeholders, or, in other words, that the term "freeholders within the proposed special school district" embraced female as well as male, and, therefore, that the petition did not have the requisite number of signers, freeholders and nonresident freeholders. The court thereupon continued to the final hearing the temporary injunction theretofore granted by Judge Bragaw, and defendants appealed.
After stating the facts: The first question for our consideration is, Can the plaintiffs now object that a sufficient (181) *Page 148 
number of qualified persons did not sign the petition for the election? We think, upon mature reflection and an examination of the authorities, that they can, as the jurisdiction, if we may so term it, of the board of education and the county commissioners is dependent upon the presentation to them of such a petition as is required by the statute, it being a condition precedent to the exercise of the particular authority conferred by the statute upon them. It was the foundation upon which all else rested, and without which the subsequent proceedings cannot stand. What is said by Justice Merrimon in McDowell v. Commissioners,96 N.C. 514, is very pertinent here: "Accepting it as true that the commissioners of Rutherford County did ascertain and declare the result of the election in question, properly and sufficiently — and this by no means appears to be certain — their action in that respect, while it could not be attacked collaterally, was not conclusive, and it might be questioned and contested in an action brought directly for that purpose. It cannot be that such a determination and exercise of authority by county commissioners, in respect to matters frequently involving questions and rights of great moment, are final and absolutely conclusive. There is certainly no statute that so provides, and the spirit and principle of law in regard to the settlement and determination of the rights of parties and the public plainly imply the contrary. . . . The chief and leading purpose of this action is to contest directly the regularity and validity of the election in question, including the ascertainment and declaration of the result thereof by the county commissioners. The plaintiff seeks to have the election adjudged void for the causes alleged, and prays for incidental equitable relief by injunction pending the action, and a perpetual injunction. We can see no reason why this is not competent, although we need not now decide conclusively any question in this respect. It is true, the plaintiff did not bring his action at once after the result of the election was declared, to contest its validity, but it was not necessary that he should do so, until some action was about to be taken in pursuance of it. It might be that the county (182) authorities, seeing the election was irregular and void, would so treat and disregard it, in which case an action to have it declared void would be unnecessary. It seems that the plaintiff gave notice of his purpose to bring his action when and as soon as it became necessary, and that he did bring it promptly after the commissioners manifested their purpose to act upon the result of the election. There is no statutory provision that requires such elections to be contested at once after they take place, and in a particular manner. It was, therefore, sufficient for the plaintiff to bring his action within a reasonable period, and in the ordinary method." *Page 149 
Referring to Smallwood v. New Bern, 90 N.C. 36, cited by appellants in that case, this Court further said in McDowell v. Construction Co., supra, that it was not applicable, it being an action to enjoin a tax, which was a collateral and not a direct attack upon the commissioners' declaration of the result of the election, and thus quoted from the opinion in that case: "If the plaintiff was dissatisfied with the action of defendants in ascertaining the result of the vote in the respect mentioned, he ought, at the proper time, to have brought his action to question the truth and justice of their decision of the matter, and had the same reversed, declared irregular and void, or properly modified. There was a remedy, but that remedy cannot be had in an action like this." And the Court, inMcDowell v. Construction Co., at p. 532, added, in connection with that extract from Smallwood v. New Bern: "Nor did this Court say, or intend to say, to the contrary, in Simpson v. Commissioners, 84 N.C. 158; Cain v.Commissioners, 86 N.C. 8, and Norment v. Charlotte, 85 N.C. 387."
Cases in the courts of other States sustain the view that the jurisdiction of the boards to pass upon the petition is special, and there is no power to act when the required number of legal signatures is wanting, and this defect can certainly be availed of by a direct impeachment of the election. It is said in Hoxie v. Scott, 45 Neb. 199: "The want of jurisdiction of the county commissioners and other officers clothed with like powers, with respect to similar petitions, to act upon the petition of less than fifty freeholders, or of a certain proportion of qualified electors, is no longer a debatable question in this State [citing cases]. As the county commissioners had presented to them no petition upon (183) which they had jurisdiction to order an election, the bonds were issued without authority of law." The case of People v. Oldtown, 88 Ill. 202, affords another illustration of the principle. An election had been held upon a petition alleged to have been signed by ten legal voters. It was not, in fact, so signed, or, at least, there was no sufficient evidence of the fact that it was, and the jury so found for their verdict. Plaintiff had applied for a mandamus to compel the delivery of certain bonds to him, which were authorized, as he alleged, by the election. The Court thus disposed of his contention: "It is, therefore, the application that confers power to call the election, and without it there could be no valid election. In a proceeding of this character, the burden is on the relator to clearly establish the right sought to be enforced." The writ was refused, as no proof had been offered that the petition contained the legal requirements. Where township bonds had been issued after an election at which, it was alleged, the issue of them had been approved by a majority of the voters, as required by the law, the Court held, inPeople v. Cline, 53 Ill. 394, that the township was not estopped to *Page 150 
question the legality of the call for or the result of the election, in an action for a mandamus to compel the issue of more bonds, when the applicant had notice of the facts. This decision is in point because, in the present case, no right of an innocent holder of bonds or one having any other equitable right has intervened, not meaning to decide that even such a state of facts would make any difference. The authorities upon this question which we have cited, and others which are applicable, are put upon the ground that there is no authority to proceed, in ordering an election, unless the proper petition has been filed, and the ordinary rule obtains that the proceeding can be directly assailed, in the absence of the facts necessary to confer jurisdiction, and that is our case. Damp v. Dane,29 Wis. 419; 15 Cyc., 319.
It should be noted that the statute (Revisal, sec. 4115) uses (184) apt words to create a condition precedent to the exercise of the power of ordering an election, the specific condition being that a petition signed by one-fourth of the freeholders shall be first exhibited to the boards before they can do what is required of them.
There is no question in this case of the bona fide purchase of bonds, issued in pursuance of an election conducted irregularly, nor any other equitable matter which would protect an innocent party. By the statute, the boards were not authorized to act at all until a properly signed petition had been filed. R. R. v. Rich Township, 45 Kan., at p. 292, citing Jones on Railway Securities, sec. 280, and cases therein mentioned; Lake County v.Graham, 130 U.S. 674; Harshman v. Bates, 92 U.S. 569.
Our opinion is that the action is properly brought, and that we can inquire into the legality of the order for the election made by the board of county commissioners, this being a direct attack upon the validity of the election, the injunctive process of the court having been invoked in aid of the main relief, and in order that the status quo may be preserved until the rights of the parties are finally determined. "We disclaim the power of the court to restrain a ministerial officer from doing an act which he has been commanded to do by the Legislature, when acting within the scope of its authority. And we put our decision upon the ground that the act here restrained is not the act which the Legislature contemplated."Perry v. Whitaker, 71 N.C. 475.
Howell v. Howell, 151 N.C. 575, to which we were referred by plaintiff's counsel, does not militate against our view, but a careful reading of it will disclose that it sustains what we have said, for Justice Manning puts the decision squarely on the ground that plaintiffs in that action could not, by injunction, assail the election because the board of education had not acted discreetly in indorsing the petition and *Page 151 
establishing the school district, nor because in other respects they may not have exercised their judgment or discretion very wisely. These matters, says he, should have been brought to the attention of the board before action was taken by it; but he expressly says that it is not alleged or shown that one-fourth of the freeholders within the district did (185) not sign the petition, nor that any other of the vital requirements of the statute had not been complied with. All this is in perfect harmony with our decision in this case.
The next question for us to answer is, Was the petition signed by one-fourth of the freeholders? This one presents more difficulty than the first, as the language of the statute, if isolated and considered by itself, without any reference to extrinsic facts, may mean one thing, while if it is examined, as it should be, in the light of proper and relevant circumstances, it may have another and quite a different meaning. Let us first inquire, Who is a freeholder? Does the term embrace women, or only men and qualified voters or electors? We think the latter is its true meaning, and is what was clearly intended by the Legislature when it chose the words with which to express its will. Judge Blackstone tells us that "an estate of freehold, liberum tenementum, or franktenement, was defined by Britton to be `the possession of the soil by a freeman.'" And St. Germyn said that "The possession of the land is called in the law of England the franktenement or freehold." Such estate, therefore, and no other, as requires actual possession of the land, is, legally speaking, freehold;
which actual possession can, by the course of the common law, be only given by the ceremony called livery of seizin, which is the same as the feodal investiture. And from these principles we may extract this description of a freehold: that it is such an estate in lands as is conveyed by livery of seizin, or, in tenements of any incorporeal nature, by what is equivalent thereto. And accordingly it is laid down by Littleton that where a freehold shall pass, it behooveth to have livery of seizin. As, therefore, estates of inheritance and estates for life could not by common law be conveyed without livery of seizin, they are properly estates of freehold; and, as no other estates are conveyed with the same solemnity, therefore no others are properly freehold estates. 2 Blackstone, star p. 104.
It appears, from this account of the great commentator, that anciently and even modernly, at the common law, a freehold was the possession of a freeman, and a freeholder, therefore, was a man, the tenure of whose land was free, that is, who held it discharged of the (186) feudal duties and services formerly imposed upon it, which women did not perform. But this definition, which confines a freeholder to the owner of land by free tenure, may not be sufficient, by itself, to restrict *Page 152 
the word, as used in our statute, to men, exclusive of women, though in speaking of the elective franchise, when based upon the ownership of a freehold, Blackstone confines its exercise to males who possess the other legal qualifications. 1 Blackstone, 171. But in the great contest between Hon. John Berry and Hon. Hugh Waddell for a seat in the State Senate, a question arose as to the meaning of a freeholder, with reference to the qualifications of persons holding, or supposed to hold, certain stated interests or estates in lands, to vote — the Constitution, at that time, requiring the possession of a freehold estate in 50 acres of land as a qualification to vote for a Senator. This Court, in response to a request for its opinion, through Chief Justice Ruffin, defined a freeholder, as used in the Constitution, and said: "The term `freehold' is a legal one, of very ancient use and of known signification in the common law. It means an estate in land, of which a freeman is seized for the term of his own life, or the life of another, at the least." Berry v. Waddell, 31 N.C. 520. And as thus understood, the right to vote has been confined to males in this State, as it was in England. 1 Blackstone, 171 et seq. We have sought in vain for anything in our law which has modified this ancient rule. Several of our statutes make use of this word "freeholder" in describing the qualification of appraisers, commissioners, and a special class of jurors, and the uniform practical construction has been that it does not include females. Revisal, secs. 2122, 2685, 2686, 2689, 5202, and others that might be mentioned. Besides, our Constitution (Art. VI, sec. 1), and the statutes enacted in pursuance thereof, provide that only native and naturalized male persons, who are of full age, shall be voters or endowed with the right of suffrage.
The whole policy of our State, so far as established by constitutional and legislative enactment to this time, has been to exclude women (187) from participation in governmental affairs and from exercising any influence, by their action or inaction, as of legal right, in controlling the right of suffrage or the right of the State, or any one of its political subdivisions, such as counties, townships, or districts, to adopt such measures as may meet with the sanction of the voters and will promote its welfare or that of the people residing within its borders. We are aware of a case in another State, Cummins v. Hyatt, 54 Neb. 38, where the Court held against our construction, but we are unable to follow the decision. It may have been influenced by statutes in force there or by a policy which does not prevail with us, or, rather, has found no lodgment here, and if not, we do not think the case is in harmony with the rulings of other courts, to be hereafter noticed, or with the rule of reason. A case arose in another State where the word "citizen" was used with reference to those who should sign a petition for a *Page 153 
liquor license, and it was held that, while females were citizens as well as males, the word was used in the sense of a person qualified to vote, and for several cogent reasons, which were clearly stated by JusticeCobb, it did not include women. Wray v. Harrison, 116 Ga. 93. And the same conclusion was reached in a case where the words "citizens and freeholders" were used in describing those qualified to sign a petition for an election to change a county-seat. Scarborough v. Eubank. (Tex.Civ.App.), 52 S.W. 569, the Court saying: "We are asked, in view of another trial, to construe the word `citizen' as used in the statute providing that a given number of citizens and freeholders might apply for an election to change the county-seat. We are disposed to adopt the view expressed by our court of criminal appeals, that, when used in such statutes, the word `citizen' should be construed to mean one who is recognized by law as competent to exercise political rights, including particularly the sovereign right of voting, and that it does not include women and children, as seems to be contended in this case. Ex parteLynn, 19 Tex. App., 294; Abrigo v. State, 29 Tex. App., 149." And to the same general effect are the following cases: School District v.School District, 63 Ark. 543; Blanch v. Pansch, 113 Ill. 60; Thomasonv. State, 15 Ind. 449; Crandall v. State, 10 Conn. 339;Blair v. Kilpatrick, 40 Ind. 312. These are strong analogies, (188) and virtually hold that when the qualification is that of "citizen," or, for the same reason, "freeholder," it means one who is a voter or elector. A similar expression was used in the Constitution of 1776, sec. 9, viz.: "that all persons possessed of a freehold in any town shall be entitled to vote for a member to represent said town in the House of Commons," and no one ever supposed that this conferred the right of female suffrage.
A statute must be construed, not textually, but contextually, and with reference to the particular matter dealt with, and the word "freeholders," when used with reference to political rights or suffrage, or governmental matters, has never been understood to include women.
But there is another principle, well settled, which applies to this case: "The construction placed upon a statute by the officers whose duty it is to execute it is entitled to great consideration, especially if such construction has been made by the highest officers in the executive department of the Government or has been observed and acted upon for many years; and such construction should not be disregarded or overturned unless it is clearly erroneous." 36 Cyc., 1140. The rule is thus substantially stated in New York v. R. R., 193 N.Y. 543; When the meaning is doubtful, a practical construction by those for whom the law was enacted, or by public officers whose duty it was to enforce it, is entitled to great *Page 154 
influence; but the ambiguity must not be captious, but should be so serious as to raise a reasonable doubt in a fair mind, reflecting honestly upon the subject. Numerous authorities agree practically that contemporaneous construction and official usage for a long period by persons charged with the administration of the law have always been regarded as legitimate and valuable aids in ascertaining the meaning of a statute. Sutherland on Stat. Constr., sec. 309; Smith v. Bryan, 100 Va. 204; 26 A. E., (2 Ed.), 633, 635; Va. C. and L. Co. v. K. C. and L. Co.,101 Va. 728; Black on Inter. of Laws, pp. 221, 222; Lewis's Suth. On Stat. Constr., sec. 474; Whittimore v. People, 227 Ill. 453 (10 Am. and Eng. Anno. Cases, 44, and note at p. 51), and Bloomer v. Todd, 1 L.R.A., 111, in which it is also held that "citizens," with reference to (189) the right of suffrage, means male persons: Brown v. U.S., 113 U.S. 568; Sedgewick on Stat. and Const. Law, 225.
It has been suggested that we should give to the word "freeholder" its technical meaning, as understood and defined in 2 Blackstone, with reference to the quantity of an estate, and without regard to the context of the statute we are construing, or to the fact that the Legislature was dealing with a question involving the exercise of the elective franchise, nor even to the uniform and long prevailing interpretation of that department of the State Government which is charged with the enforcement and execution of this law. We could not do so without plainly disregarding every well-known rule of statutory construction. Such a meaning of the word would be far more antiquated and moss-covered — dating back to the time of Blackstone, Cruise, and Coke, and even to the era of the Year Book and Domesday — than the sensible and enlightened one of a more modern age.
If by the word "freeholder" was meant merely one who had an estate in fee or for life, then, by the same token, the word, when used in the statutes, as to jurors, appraisers, and commissioners, must be given the same meaning; and we all known that time out of mind, and by common consent, the unvarying construction of the word, as thus used, has excluded females.
It is far more reasonable to exclude them, in this instance, for otherwise they would, in a very important respect, be indirectly controlling the electorate by their silent vote, which they could use to prevent a vote by the people upon questions concerning their local and vital interests. The Legislature has never, as yet, endowed women with the right to participate in governmental affairss [affairs], for reasons satisfactory to itself. It establishes the public policy of the State, and we have no power vested in us by the Constitution to question its motives or the wisdom of its policy. We must accept it and enforce it as we find it, and not *Page 155 
as we may think it should be, as we do not make the law, but merely declare what it is. If any such radical change in our governmental policy is to be made, it should originate in the Legislature, (190) acting within its legislative sphere, and not in this Court.
It is inconceivable that a consistent and persistent construction given to similar statutes by the Superintendent of Public Instruction and his legal adviser, the Attorney-General, for so long a time, should have escaped the attention of the Legislature, and its silence may be safely construed as an assent to their interpretation of the word.
The reason which would extend the scope of the word "freeholder" so as to embrace women, would apply also to nonresidents and infants, and it is too plain for discussion that, by the very language and purpose of the statute, they were not intended to be included. They are entitled to as much protection as the residents and adults of the school district. We prefer to adopt the uniform construction of the departments, which we believe to be in accord with the manifest intention of the lawmaking body and the great weight of authority. It is easy for the Legislature to change that meaning if, in its wisdom, a different policy should be inaugurated. Until that is done, we will stand by the ancient and settled rule of interpretation. "A contemporary exposition, practiced and acquiesced in for a period of years, fixes the construction, unless contrary to the obvious meaning of the words." Attorney-General v. Bank, 40 N.C. 71, citing Stewartv. Laird, 1 Cranche (U.S.), 299. This is also a rule in the construction of contracts when the meaning is doubtful. Attorney-General v. Bank, supra, at page 72. This record discloses that the educational department and the Attorney-General, its legal adviser, have constantly and consistently for years construed this particular statute to mean that the petition must be signed by free holders who are voters. This excludes women and nonresidents.
It cannot successfully be argued that there is no doubt about the meaning of the word "freeholder" as used in section 4115. On the contrary, it is involved in a great deal of doubt, with a decided preference, though, for the departmental interpretation, and this we adopt as being not only a safe guide, but as agreeing with our notion of what the Legislature meant.
It results that the petition was signed by the requisite number (191) of freeholders, and the board of county commissioners lawfully ordered the election. But this would not reverse the ruling of the court if there is a serious controversy between the parties as to the validity of the election itself, the plaintiffs alleging that the proposal submitted to the people to establish a school district and levy a tax for its maintenance did not receive a majority of the qualified votes in its *Page 156 
favor, and the defendants denying this and averring that such a majority of the votes was cast in favor of the school district and tax. If there is such a controversy as to the election, it would require us to sustain the judge's ruling, by which he granted an injunction to the hearing, and to remand the case for the trial of the issue as to the election, though his decision upon the other matter was erroneous. We would, in such an event, affirm the judgment, which would be correct, though the learned judge gave the wrong reason for his ruling. It would simply place the order on its true foundation, so that it may stand, disregarding the reason assigned by the court for making it. But upon a careful examination of the allegations of the respective parties, treating the pleadings as affidavits, we are satisfied that there is no such real and serious dispute as to the result of the election as to warrant the continuance of the injunction to the final hearing. When the figures, as stated by the plaintiffs, are scrutinized and the admitted facts are considered with them, it appears that the question submitted to the people received the approval of a majority of the qualified voters, though small it may have been. At the very most, the plaintiffs have not presented such a case as should induce the court to put forth its restraining arm and thus postpone the execution of the people's will. We, therefore, reverse the judgment continuing the injunction to the final hearing, but without prejudice to a renewal of the motion of plaintiffs for such an injunction, upon new or additional facts showing their right to it under the well-settled principles of law relating to such cases.
Counsel for plaintiffs moved in this Court to dismiss the appeal upon the ground that it is fragmentary and premature, and relied on Rogersonv. Lumber Co., 136 N.C. 266; Shelby v. R. R., 149 N.C. 537, and Higgs v. Gooch, 93 N.C. 112; but they are not applicable. In (192) the first of the cases we said: "We were asked to decide, not the whole controversy, but only a part of the case. If we should comply with the request, and the case should be further tried upon the question of damages, and the other side should allege errors in the trial of that issue and appeal, we should have the anomalous case presented of two judges trying two parts of the same controversy, which the law has always required to be tried by only one." It is apparent that this case and those just cited are much alike. The judge continued the injunction to the hearing, and from his order the defendant properly entered an appeal. The order was interlocutory merely, and clearly reviewable, by appeal, in this Court, as it affected a substantial right. Revisal, sec. 587; Bank v. Jenkins, 64 N.C. 720. There are no two branches in this case, as there were in each of those relied on, but only one question, viz., the right to an injunction, though two propositions are involved in it, *Page 157 
one as to the petition and the other as to the election. It would, perhaps, have been better if the judge had passed upon the facts in regard to the election, as well as those concerning the petition; but, as we can review his findings, it is competent for this Court, in such a case as this, to determine the whole matter here, when it can see that there is really no serious controversy as to the facts. With the other question settled, it may be that the parties can adjust their differences without longer protracting the litigation.
Reversed.