CAPE HATTERAS ELECTRIC MEMBERSHIP CORPORATION, PLAINTIFF v. KENNETH R. LAY, SECRETARY OF THE NORTH CAROLINA DEPARTMENT OF REVENUE, DEFENDANT

No. COA10-271

(Filed 1 March 2011)

**1. Taxation— sale of electricity—legislative act—exemption from taxes**

The trial court did not err in a case concerning taxes levied on plaintiff's sale of electricity by concluding that the special legislative act at issue was ambiguous, and, therefore, that the legislative intent must be ascertained. Furthermore, the trial court did not err in its determination that the clear legislative intent of the act was for plaintiff to maintain its tax-favored public agency status and to be exempt from paying franchise tax.

**2. Taxation— sale of electricity—indirect taxation—unsupported conclusions—irrelevant**

In a case involving taxes levied on plaintiff's sale of electricity, the findings of fact did not support the conclusions of law that defendant was not able to tax plaintiff indirectly by taxing plaintiff's third-party supplier. Nevertheless, the conclusions of law had no

impact on the trial court's ultimate decree that plaintiff was not subject to sales or franchise taxes and that defendant must refund such taxes paid since 2000.

**3. Taxation— sale of electricity—exemption from taxes— credit to customers not required**

Where the trial court correctly concluded that plaintiff was exempt from paying certain taxes on its sale of electricity, plaintiff did not have to demonstrate that it had credited its customers prior to receiving the ordered refund. Based on the clear and specific language of former N.C.G.S. § 105-267, the judgment entered shall be collected as in other cases and N.C.G.S. § 105-164.11 did not control this case.

**4. Taxation— sale of electricity—exemption from taxes— interest on entire judgment**

In a case involving taxes levied on plaintiff's sale of electricity, plaintiff was entitled to interest on the entire judgment at the legal rate pursuant to N.C.G.S. § 105-267.

Appeal by defendant from judgment entered 24 November 2009 by Judge Jerry R. Tillett in Dare County Superior Court. Heard in the Court of Appeals 14 September 2010.

*Vandeventer Black LLP, by Norman W. Shearin and David P. Ferrell, for plaintiff-appellee.*

*Attorney General Roy Cooper, by Assistant Attorney General Terence D. Friedman, for defendant-appellant.*

HUNTER, Robert C., Judge.

Defendant Kenneth R. Lay, Secretary of the North Carolina Department of Revenue ("NCDOR") appeals from a judgment entered 24 November 2009. After careful review, we affirm.

<u>Background</u>

Plaintiff Cape Hatteras Electric Membership Corporation ("CHEMC") was originally incorporated on 30 March 1945 under former N.C. Gen. Stat. § 117-19 for the purpose of providing low cost electric service on a non-profit basis to consumers on Hatteras Island, North Carolina. N.C. Gen. Stat. § 117-19 was enacted in 1935 and declared all electric membership corporations ("EMCs") to be public agencies. The statute stated:

Whenever an electric membership corporation is formed in the manner herein provided, the same shall be, and is hereby declared to be a public agency, and shall have within its limits for which it was formed the same rights as any other political subdivision of the State, and all property owned by said corporation and used exclusively for the purpose of said corporation shall be held in the same manner and subject to the same taxes and assessments as property owned by any county or municipality of the State so long as said property is owned by said electric membership corporation and is used for the purpose for which the corporation was formed.

N.C. Gen. Stat. § 117-19. Pursuant to this statute, CHEMC and Ocracoke Electric Membership Corporation ( "Ocracoke EMC") were deemed to be public agencies and were not required to pay any taxes on the sale of electricity.

The evidence at the bench trial in this matter tended to show that in the early 1960's, disputes arose between EMCs and investor owned utilities ( "IOUs") regarding the provision of electric service to previously unserved territories. In the mid-1960's, EMCs and IOUs began petitioning the General Assembly to pass legislation favorable to their respective positions. After the 1964 election, Governor-elect Dan K. Moore asked representatives of the EMCs and IOUs to reach a compromise. The result was a compromise which involved the assignment of service territories to EMCs and IOUs and the loss of public agency status for EMCs. However, CHEMC and Ocracoke EMC were in a unique position because they had no competitors and the IOUs were not interested in servicing Hatteras or Ocracoke islands.

On 9 March 1965, four bills were introduced in both the House and Senate by the chairs of the House and Senate Public Utilities Committees. These bills constituted the so called "Territorial Act". House Bill 255/Senate Bill 95 proposed to end the public agency status of EMCs; House Bill 256/Senate Bill 96 declared the telephone cooperatives to be public agencies; House Bill 257/Senate Bill 97 declared Ocracoke EMC to be a public agency; and House Bill 258/Senate Bill 98 declared CHEMC to be a public agency.

On 20 April 1965, N.C. Gen. Stat. § 117-19 was amended by House Bill 255, to state that henceforth "no [EMC] . . . shall be a public agency; nor shall any such corporation be, or have the rights of, a political subdivision of the State." However, the General Assembly, in accordance with the respective House and Senate bills, enacted session laws that declared CHEMC, Ocracoke EMC, and the telephone

cooperatives to be public agencies. As it relates to this case, House Bill 258/Senate Bill 98 was codified on 28 April 1965 as a Session Law entitled: "An Act To Declare Cape Hatteras Electric Membership Corporation To Be A Public Agency And Provide That It Shall Be Exempt From Certain Taxation" ("the Special Act"). As a result of the amended statute and enacted session laws, all EMCs, except CHEMC and Ocracoke EMC, no longer had public agency status and were required to pay franchise tax on revenue generated from the sale of electricity.

On 6 July 1984, the General Assembly enacted Chapter 1097 of the 1984 Session Laws, which split the franchise tax levied on EMCs into franchise and sales taxes. Sales tax was only levied on sellers of electricity who were previously required to pay franchise tax. Since CHEMC was not previously required to pay franchise tax it was not required to pay sales tax. Following a sales tax audit, in a letter dated 4 April 1990, NCDOR acknowledged that CHEMC was not required to pay sales tax due to its status as a public agency.

From 1965 to 2000, CHEMC was never required to pay franchise or sales taxes. On 24 February 2000, the Sales and Use Tax Division of NCDOR sent a letter to CHEMC stating that as of 1 March 2000, CHEMC would be required to pay sales tax on its sale of electricity as set out in N.C. Gen. Stat. § 105-164.4(4a). In a 22 May 2000 follow-up letter, NCDOR stated that CHEMC was required to pay sales tax because of an amendment made to N.C. Gen. Stat. § 105-164.3(25) during the 1999 Session of the General Assembly, which expanded the definition of utility to include "a business entity or municipality that sells electric power[.]" The letter went on to state NCDOR's position that the changes to G.S. 105-164.3(25) were designed to treat all sellers of electricity alike for sales and use tax purposes, and the only specific exemption provided was for a municipality whose only wholesale supplier of electric power is a federal agency[.]"[1] On 22 June 2000, NCDOR informed CHEMC that it would also have to pay franchise tax in addition to sales tax. NCDOR concluded that the Special Act only granted CHEMC a property tax exemption. CHEMC has paid franchise and sales taxes since 2000 under protest.[2]

---

1. It does not appear that NCDOR argued before the trial court that the 1999 amendment to N.C. Gen. Stat. § 105-164.3(25) served as the basis for its change in position with regard to taxation of CHEMC nor does NCDOR make that argument on appeal. The definition of utility was removed entirely from N.C. Gen. Stat. § 105-164.3 by Session Law 2001-430, effective 1 January 2002.

2. According to the record, Ocracoke EMC has merged with Tideland Electric Membership Corporation. It does not appear that Ocracoke EMC was ever subjected to franchise or sales taxes prior to the merger.

On 17 November 2000, CHEMC filed a complaint pursuant to N.C. Gen. Stat. § 105-267 (2000) demanding a refund of sales tax paid since 28 July 2000 and asking the trial court to hold that "[CHEMC] is not subject to or liable for sales and franchise taxes[.]" On 23 April 2003, CHEMC amended its complaint to seek a refund for franchise tax paid since 1 January 2001. On 6 August 2007, a bench trial was conducted in Dare County Superior Court before Judge Jerry R. Tillett. Additional arguments were heard on 1 June 2009 and 29 October 2009. On 24 November 2009, Judge Tillett entered judgment in favor of CHEMC, determining that CHEMC was not subject to franchise or sales taxes and ordering NCDOR to refund CHEMC the principal amount of taxes paid in the amount of $7,295,773.65 plus interest. NCDOR was required to pay all costs of the action. NCDOR timely appealed to this Court.

## Standard of Review

"It is well settled in this jurisdiction that when the trial court sits without a jury, the standard of review on appeal is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts." Shear v. Stevens Building Co., 107 N.C. App. 154, 160, 418 S.E.2d 841, 845 (1992). Findings of fact by the trial court in a non-jury trial have the force and effect of a jury verdict and are conclusive on appeal if there is evidence to support those findings." Id. The trial court's conclusions of law are reviewable de novo. Id.

## Discussion

### I.

[1] As a preliminary matter, the franchise tax at issue was in existence in 1965 when the Special Act was passed; however, the sales tax statute was not enacted until 1984. Accordingly, we first address the effect of the Special Act as it relates to the franchise tax and then we will address the implication of the enactment of the sales tax statute.

NCDOR argued before the trial court, and argues now on appeal, that there is no ambiguity in the Special Act and the plain language of the statute does not exempt CHEMC from paying franchise and sales taxes; however, if there is an ambiguity in the Special Act, then rules of statutory construction require that such ambiguity be resolved in NCDOR's favor. CHEMC argues that the Special Act is ambiguous because it does not define "public agency," and, therefore, the Court must discern the legislative intent of the Special Act. CHEMC con-

tends that the clear legislative intent was to give CHEMC tax exempt status. The trial court concluded as a matter of law:

8. The Special Act is ambiguous and therefore the Court must construe it to ascertain the intent of the legislature.

9. Alternatively, the language of the Special Act is clear and unambiguous but a clearly expressed legislative intent requires judicial interpretation. Uncertainty as to the meaning of the Special Act arises from the fact that giving a literal interpretation to the words thereof would lead to unreasonable, unjust, impracticable, or absurd consequences by the General Assembly.

. . . .

22. [T]he Special Act continues the tax-favored public agency status for CHEMC that all EMCs enjoyed under former N.C. Gen. Stat. § 117-19.

23. The Special Act exempts CHEMC from sales and franchise taxes on its sale of electricity to its members.

Accordingly, we must first ascertain whether the Special Act is ambiguous on its face. "A long-standing rule of statutory construction declares that a facially clear and unambiguous statute requires no interpretation." Taylor v. City of Lenoir, 129 N.C. App. 174, 179, 497 S.E.2d 715, 719 (1998). The Special Act states:

Sec[]. 1. Cape Hatteras Electric Membership Corporation, heretofore created and now existing under and by virtue of the provisions of Chapter 117 of the General Statutes of North Carolina, being presently engaged in supplying electric service to the inhabitants of Hatteras Island under circumstances peculiar to the island in that it is a sparsely settled area which is isolated from the mainland of the State of North Carolina and is without available electric service from any other source, necessitating exceptionally costly, small-scale generation of electric energy upon the island for distribution thereon, is hereby declared to be a public agency for the performance for its members of the services which the charter heretofore granted to such corporation authorizes and empowers it to perform.

Sec. 2. Cape Hatteras Electric Membership Corporation shall have the powers enumerated in the charter heretofore granted to it together with all other powers of any electric membership cor-

poration created under and by virtue of the provisions of Chapter 117 of the General Statutes of North Carolina.

Sec. 3. All property owned by Cape Hatteras Electric Membership Corporation and used exclusively for the purpose of said corporation shall be held in the same manner and subject to the same taxes and assessments as property owned by any county or municipality of the State so long as said property is owned by said Cape Hatteras Electric Membership Corporation and is held and used by it solely for the furnishing of electric energy to consumers on Hatteras Island and Ocracoke Island.

Sec. 4. The provisions of this· Act shall not affect the validity of any existing law or of any law that may hereafter be enacted which imposes or levies any tax, or which provides procedure with respect to taxation, and if any provision of this Act shall be deemed by a court of competent jurisdiction, in any action pending before such court, to affect adversely the constitutionality of any such law, or any part thereof, such court shall direct that the Cape Hatteras Electric Membership Corporation be made a party to such action and that it be afforded due opportunity to be heard upon such question, and if, upon hearing, the court concludes that such provision of this Act, if valid and in effect, would affect adversely the constitutionality of such other law, this entire Act shall be null and void and of no effect and the court shall so declare and adjudge.

(Emphasis added).

The clear language of the Special Act sets out that CHEMC is a public agency and the reason for that classification—the limited availability of electricity for the Hatteras Island residents and the costly endeavor of supplying electricity to the island. Although the legislature clearly sought to grant CHEMC some special consideration as a public agency in section one, the Special Act does not define public agency. NCDOR has not pointed out the relevance of public agency status other than to set out a verbatim recitation of the language of the Special Act, which states that the public agency is formed for the performance for its members of the services which the charter heretofore granted to such corporation authorizes and empowers it to perform." Id. This description of CHEMC's duty to act in accordance with its charter does not relay the import of public agency status. Section three states how property owned by CHEMC

will be taxed, but that does not resolve the question of what privileges were conferred on CHEMC due to its public agency status.

Because of the facial ambiguity in the Special Act, we must seek to ascertain the legislative intent behind the Special Act's grant of public agency status to CHEMC.

> The principal goal of statutory construction is to accomplish the legislative intent. The intent of the General Assembly may be found first from the plain language of the statute, then from the legislative history, the spirit of the act and what the act seeks to accomplish. If the language of a statute is clear, the court must implement the statute according to the plain meaning of its terms so long as it is reasonable to do so.

Lenox, Inc. v. Tolson, 353 N.C. 659, 664, 548 S.E.2d 513, 517 (2001) (internal citations and quotation marks omitted). To ascertain legislative intent, the "courts should consider the language of the statute, the spirit of the statute, and what it seeks to accomplish." Taylor, 129 N.C. App. at 177, 497 S.E.2d at 718 (quoting State ex rel. Utilities Commission v. Public Staff, 309 N.C. 195, 210, 306 S.E.2d 435, 444 (1983))." 'Other indicia considered by th[e] Court in determining legislative intent are the legislative history of an act and the circumstances surrounding its adoption[.]' " County of Lenoir v. Moore, 114 N.C. App. 110, 115, 441 S.E.2d 589, 592 (1994) (quoting In Re Banks, 295 N.C. 236, 239-40, 244 S.E.2d 386, 389 (1978)), aff'd, 340 N.C. 104, 455 S.E.2d 158 (1995).

> Special canons of statutory construction apply when the term under consideration is one concerning taxation. When the meaning of a term providing for taxation is ambiguous, it is construed against the state and in favor of the taxpayer unless a contrary legislative intent appears. But when the statute provides for an exemption from taxation a contrary rule applies and any ambiguities are resolved in favor of taxation. The underlying premise when interpreting taxing statutes is: Taxation is the rule; exemption the exception. In all tax cases, the construction placed upon the statute by the Commissioner of Revenue, although not binding, will be given due consideration by a reviewing court. Despite these special rules, our primary task in interpreting a tax statute, as with all other statutes, is to ascertain and adhere to the intent of the Legislature. The cardinal principle of statutory construction is that the intent of the Legislature is controlling.

Matter of North Carolina Inheritance Taxes, 303 N.C. 102, 106, 277 S.E.2d 403, 407 (1981) (internal citations and quotation marks omitted) (emphasis added). CHEMC argues that an examination of the legislative intent behind the Special Act reveals that public agency status was conferred upon CHEMC in 1965 to maintain the status quo. We agree.

First, a comparison of former N.C. Gen. Stat. § 117-19 and the Special Act is revealing. CHEMC was organized pursuant to former N.C. Gen. Stat. § 117-19, which stated that all EMCs were public agencies. In 1965, N.C. Gen. Stat. § 117-19 was amended and declared that EMCs were no longer public agencies; however the Special Act carved out an exception for CHEMC and Ocracoke EMC and maintained their public agency status, presumably for the reasons set out in section one. Additionally, former N.C. Gen. Stat. § 117-19 contained the following language: "[A]ll property owned by said corporation and used exclusively for the purpose of said corporation shall be held in the same manner and subject to the same taxes and assessments as property owned by any county or municipality of the State." The same language appears in section three of the Special Act. NCDOR argues that the Special Act, via the language of section three, only exempts CHEMC from ad valorem property taxes. It is true that section three mirrors the language of Article V section 2(3) of the North Carolina Constitution, which states: "Property belonging to the State, counties, and municipal corporations shall be exempt from taxation." Our Supreme Court has determined that this language only pertains to ad valorem property taxes. Sykes v. Clayton, 274 N.C. 398, 405-06, 163 S.E.2d 775, 780-81 (1968) (interpreting Article V of the North Carolina Constitution then in effect, which contained identical language to Article V section 2(3)). It is clear and undisputed that former N.C. Gen. Stat. § 117-19, which contained the same language as section three of the Special Act, intended to exempt CHEMC from ad valorem property taxes.[3] However, former N.C. Gen. Stat. § 117-19 also declared EMCs to be public agencies and that term was interpreted to mean that they did not have to pay franchise tax. The Special Act declares CHEMC to be a public agency. In sum, an examination of the language of former N.C. Gen. Stat. § 117-19 and the Special Act leads us to determine that the legislature intended for CHEMC to remain a public agency and thus be exempt from franchise

---

3. We note that the legislature may have seen a need to specifically include section three pertaining to ad valorem property tax because property tax is a local tax imposed by municipalities and counties as opposed to the state imposed franchise tax.

tax as it had been in the past, not merely exempt from ad valorem property tax.

Second, viewing the Territorial Act as a whole reveals the legislature's intent.

> When multiple statutes address a single matter or subject, they must be construed together, in pari materia, to determine the legislature's intent. Statutes in pari materia must be harmonized, to give effect, if possible, to all provisions without destroying the meaning of the statutes involved. Stated another way, statutes relating to the same subject or having the same general purpose, are to be read together, as constituting one law . . . such that equal dignity and importance will be given to each.

Taylor, 129 N.C. App. at 178, 497 S.E.2d at 719 (internal citations and quotation marks omitted). While the amendment to N.C. Gen. Stat. § 117-19 ended public agency status for EMCs, the Special Act restored that public agency status to CHEMC, Ocracoke EMC, and the telephone cooperatives. The obvious intent was to maintain the status quo for these particular entities due to their unique circumstances. NCDOR points out that the Special Act was enacted eight days after the amendment to N.C. Gen. Stat. § 117-19. The Special Act states that "[t]he provisions of this Act shall not affect the validity of any existing law . . . ." NCDOR argues that the Special Act could not, therefore, affect the validity of amended N.C. Gen. Stat. § 117-19, which was already in effect and ended public agency status for EMCs. NCDOR's logic would render at least that portion of the Special Act a nullity, an absurd result that we do not believe the legislature intended. Comr. of Insurance v. Automobile Rate Office, 294 N.C. 60, 68, 241 S.E.2d 324, 329 (1978) "( In construing statutes courts normally adopt an interpretation which will avoid absurd or bizarre consequences, the presumption being that the legislature acted in accordance with reason and common sense and did not intend untoward results.").

Third, the very name of the Special Act sets out its purpose, "To Declare Cape Hatteras Electric Membership Corporation To Be A Public Agency And Provide That It Shall Be Exempt From Certain Taxation[.] " " ' [W]hen the meaning of an act is at all doubtful, ' " the title should be examined because it serves as " 'a legislative declaration of the tenor and object of the Act.' " Sykes v. Clayton, 274 N.C. 398, 406, 163 S.E.2d 775, 781 (1968) (quoting State v. Woolard, 119 N.C. 779, 780, 25 S.E. 719, 719 (1896)). Given the title of the Act, it is

only logical to surmise that the legislature intended for CHEMC to continue to have public agency status and, therefore, continue to be excluded from certain taxation, namely, franchise and ad valorem taxes. When read in para materia with other bills contained in the Territorial Act, it becomes clear that CHEMC was to retain the same tax exempt status it enjoyed prior to the 1965 Amendment to N.C. Gen. Stat. § 117-19. NCDOR argues that had the legislature intended to exempt CHEMC from all taxes, it would have explicitly set that out in the Special Act. NCDOR ignores the fact that CHEMC was not excluded from all taxation. Prior to and after 1965, CHEMC was required to pay sales tax on their retail purchases of tangible property. CHEMC was exempt from paying franchise and ad valorem property taxes pursuant to former N.C. Gen. Stat. § 117-19 and subsequently the Special Act.

Fourth, "[o]rdinarily, the interpretation given to the provisions of our tax statutes by the Commissioner of Revenue will be held to be prima facie correct and such interpretation will be given due and careful consideration by this Court." In re Vanderbilt University, 252 N.C. 743, 747, 114 S.E.2d 655, 658 (1960); N.C. Gen. Stat. § 105-264 (2009). Moreover,

> [t]he construction placed upon a statute by the officers whose duty it is to execute it is entitled to great consideration, especially if such construction has been made by the highest officers in the executive department of the Government or has been observed and acted upon for many years; and such construction should not be disregarded or overturned unless it is clearly erroneous.

Gill v. Commissioners, 160 N.C. 144, 153, 76 S.E. 203, 208 (1912) (emphasis added). NCDOR argues that we should give deference to its current interpretation of the Special Act, which would require us to ignore the original interpretation that was acquiesced in over a long period of time. Petty v. Owen, 140 N.C. App. 494, 500, 537 S.E.2d 216, 220 (2000) ("[A]n administrative interpretation of a statute, acquiesced in over a long period of time, is properly considered in the construction of the statute by the courts."). Although the interpretation by the Secretary is prima facie correct, in conducting statutory interpretation we must consider the fact that NCDOR's 1965 interpretation of the Special Act was made within the same historical context, and, most likely, with a better understanding of its purpose and implications. Consequently, we give greater weight to that interpretation than the reversal of position in 2000, 35 years later.

Finally,

[t]he legislature is presumed to act with full knowledge of prior and existing law. When the legislature chooses not to amend a statutory provision that has been interpreted in a specific way, we assume it is satisfied with the administrative interpretation. Nevertheless, it is ultimately the duty of courts to construe administrative statutes; courts cannot defer that responsibility to the agency charged with administering those statutes.

Wells v. Consol. Judicial Ret. Sys. of N.C., 354 N.C. 313, 319, 553 S.E.2d 877, 881 (2001). NCDOR claims that the legislature has known since 2000 that CHEMC is now required to pay franchise tax and has not taken steps to clarify the Special Act. However, the converse of this argument is also true—that the legislature enacted the Special Act in 1965 and was presumably satisfied with NCDOR's interpretation from 1965 to 2000. While NCDOR points to changes in the law that occurred between 1965 and 2000, it is unable to cite a single statutory provision that can be inferred to end public agency status for CHEMC.[4]

In sum, we hold that the trial court did not err in its conclusion of law that the Special Act is ambiguous, and, therefore, the legislative intent must be ascertained. Furthermore, the trial court did not err in its determination that the legislative intent is clear and that the legislature intended for CHEMC to maintain its tax-favored public agency status. Consequently, CHEMC is exempt from paying franchise tax.

Next, we consider whether CHEMC must pay sales tax, which it has paid under protest since 2000. Pursuant to N.C. Gen. Stat. § 105-164.4 (a)(4a) (2009), sales tax is currently levied on the "gross receipts derived from sales of electricity." According to the statute, "[a] person who sells electricity is considered a retailer . . . . Id. A person is defined for tax purposes as, inter alia, a corporation or unit of government." N.C. Gen. Stat. § 105-228.90(b)(5) (2009). NCDOR taxes all electricity retailers based on these statutes and argues that CHEMC fits into the definition of an electricity retailer and should be taxed accordingly. We agree that these statutes standing alone would serve as a basis for imposing sales tax on CHEMC; however, we hold that the Special Act exempts CHEMC from sales tax. Our primary rationale for this holding is the fact that sales tax

---

4. The legislature is free to amend the statutes and remove public agency status from CHEMC at any time.

was only levied on those entities that were already subject to the franchise tax, and, in essence, did not increase the tax burden. In other words, the addition of sales tax did not serve to raise additional revenue for the State. Patrick Herman, a tax partner with Vandeventer Black, LLP, who serves as general counsel for CHEMC, stated in his affidavit that sales tax "enable[d] individuals to deduct the sales taxes on their federal income tax returns. There was no effect on the amount of tax ultimately paid by the consumer." On 23 January 1985, Eric Gooch, Director of the Sales and Use Tax Division of NCDOR, issued a memorandum in which he explained that CHEMC was not liable for collecting and remitting sales tax due to its public agency status. NCDOR followed this interpretation from 1985 to 2000. On 4 April 1990, NCDOR performed a tax audit of CHEMC and affirmed in writing that CHEMC was not subject to sales tax. Again, NCDOR's interpretation acquiesced in over a long period of time is indicative of legislative intent. Owen, 140 N.C. App. at 500, 537 S.E.2d at 220. As the language of the Special Act indicates, the legislature sought to give CHEMC tax-favored status because of the exceptionally costly, small-scale generation of electric energy" in which it was, and still is, engaged. The legislature clearly intended for CHEMC to be a public agency exempt from burdensome taxation. Allowing NCDOR to impose sales tax, which was only levied on those who already paid franchise tax, would be contrary to the clearly expressed legislative intent behind the Special Act. Because CHEMC is a public agency, it is exempt from paying franchise and sales taxes. Consequently, the trial court did not err in so holding.[5] In sum, NCDOR seeks to impose franchise and sales taxes by reversing a 35-year-long interpretation of the Special Act. NCDOR asks this Court to give deference to its current interpretation and simply ignore the clear legislative intent. We decline to do so and hold that the language of the Special Act, its relation to other bills in the Territorial Act, and the title of the Special Act, along with NCDOR's interpretation of the Act from 1965 to 2000 and the legislature's presumed approval of that interpretation establishes the intent of the Special Act—to confer public agency status on CHEMC and exempt it from paying certain

---

5. NCDOR points to several pieces of evidence considered by the trial court, such as newspaper clippings and the affidavit of a former legislator, and argues that this evidence should not have been considered as evidence of legislative intent. NCDOR does not argue that any particular finding of fact is erroneous. Assuming, *arguendo*, that this evidence should have been excluded, the remaining evidence was sufficient to establish legislative intent and support the trial court's findings of fact and conclusions of law.

taxation, including franchise tax and subsequently sales tax.[6] Due to our holding on this issue, we need not reach the arguments concerning estoppel.

## II.

**[2]** NCDOR argues on appeal that even if the Special Act exempts CHEMC from paying sales and franchise taxes, it can still enforce the taxes against CHEMC's third-party electricity supplier. The trial court concluded as a matter of law that NCDOR "cannot lawfully levy and collect said taxes from CHEMC, directly or indirectly." (Emphasis added). Additionally, the court concluded that "DOR is not empowered to levy and collect sales and franchise taxes from CHEMC indirectly by imposing said taxes on its supplier of wholesale power such that the cost of purchased power includes sales or franchise taxes." NCDOR claims that these conclusions of law are erroneous and that it is permitted to tax CHEMC's third-party electricity supplier.

Although the trial court concluded as a matter of law that NCDOR is not able to tax CHEMC indirectly by taxing CHEMC's third-party supplier, it did not prohibit NCDOR from doing so in its final decree nor did the trial court issue a separate injunction. The trial court made no findings of fact to support these conclusions of law and the parties have not cited any evidence in the record pertaining directly to this issue.[7] Effective appellate review of an order entered by a trial court sitting without a jury is largely dependent upon the specificity by which the order's rationale is articulated. Evidence must support findings; findings must support conclusions; conclusions must support the judgment. Each . . . link in the chain of reasoning must appear in the order itself. Where there is a gap, it cannot be determined on appeal whether the trial court correctly exercised its function to find the facts and apply the law thereto. Coble v. Coble, 300 N.C. 708, 714, 268 S.E.2d 185, 190 (1980); N.C. Gen. Stat. § 1A-1, Rule 52(a)(1) (2009) ("In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment.").

---

6. We note that had we agreed with NCDOR that the Special Act is unambiguous, we would still have reached the same result given the overwhelming evidence of legislative intent that can not be ignored

7. NCDOR references the testimony of one of CHEMC's expert witnesses who described the manner in which CHEMC receives electricity from a third-party supplier; however, this testimony does not pertain to the legal issue of whether or not NCDOR is able to tax the third-party supplier.

Here, there are no findings of fact to support conclusion of law 33 · or that portion of conclusion of law 32 which states that NCDOR is not permitted to tax CHEMC indirectly. "A bare conclusion unaccompanied by the supporting grounds for that conclusion does not comply with G.S. 1A-1, Rule 52(a)(1)." Appalachian Poster Adver. Co. v. Harrington, 89 N.C. App. 476, 480, 366 S.E.2d 705, 707 (1988). Moreover, there appears to be no evidence upon which findings could have been made.[8] Not only were there no findings and no evidence presented on this issue, the trial court did not state the legal rationale for entering these particular conclusions of law.

Consequently, we hold that these conclusions of law were not supported by the findings of fact or the evidence of record.[9] Nevertheless, these two conclusions of law have no impact on the ultimate outcome of this case. The trial court decreed, and we affirm, that CHEMC is not subject to sales or franchise taxes and NCDOR must refund such taxes paid since 2000. See Starco, Inc. v. AMG Bonding & Ins. Serv., Inc., 124 N.C. App. 332, 335, 477 S.E.2d 211, 214 (1996) ("[T]o obtain relief on appeal, an appellant must not only show error, . . . appellant must also show that the error was material and prejudicial, amounting to denial of a substantial right that will likely affect the outcome of an action.").[10]

III.

[3] NCDOR argues that if the Special Act exempts CHEMC from paying sales tax, CHEMC cannot obtain a refund for sales tax pursuant to the judgment without first proving it has refunded or credited the tax to its customers. NCDOR cites N.C. Gen. Stat. § 105-164.11(a) (2009), which states in relevant part: "When tax is collected for any period on exempt or nontaxable sales, the tax erroneously collected shall be remitted to the Secretary and no refund shall be made to a taxpayer

---

8. We note that while CHEMC requested in its complaint "such further relief that [the trial court] deems appropriate[,]" CHEMC did not request that the trial court bar NCDOR from taxing its third-party supplier. The complaint and the evidence presented at the bench trial pertained to the implications of the Special Act and whether NCDOR could tax CHEMC *directly*.

9. To be clear, we are not determining whether NCDOR may tax CHEMC indirectly by taxing CHEMC's third-party supplier; rather, we are merely holding that the findings of fact do not support the trial court s conclusions of law. As stated *supra*, NCDOR may not tax CHEMC directly.

10. Since these conclusions of law have no affect on the ultimate disposition of this case, we see no need to remand this case to the trial court for modification of the order.

unless the purchaser has received credit for or has been refunded the amount of tax erroneously charged."

Plaintiff brought this action pursuant to N.C. Gen. Stat. § 105-267,[11] which stated in pertinent part:

The suit may be brought in the Superior Court of Wake County, or in the county in which the taxpayer resides at any time within three years after the expiration of the 90-day period allowed for making the refund. If upon the trial it is determined that all or part of the tax was levied or assessed for an illegal or unauthorized purpose, or was for any reason invalid or excessive, judgment shall be rendered therefor, with interest, and the judgment shall be collected as in other cases. The amount of taxes for which judgment is rendered in such an action shall be refunded by the State.

(Emphasis added).

N.C. Gen. Stat. § 105-267 specifically pertains to collecting a judgment pursuant to court order where the court has determined that "the tax was levied or assessed for an illegal or unauthorized purpose, or was for any reason invalid or excessive . . . ." The trial court determined that NCDOR was unauthorized to collect taxes from CHEMC because it is exempt from taxation due to the Special Act. N.C. Gen. Stat. § 105-164.11 pertains to "excessive and erroneous" collections and refers to the collection of "exempt or nontaxable sales." While it is arguable that N.C. Gen. Stat. § 105-164.11 applies since the tax collected was "exempt," we hold that the more specific terms of N.C. Gen. Stat. § 105-267 apply, and, therefore, the judgment shall be collected as in other cases."

"Where there is one statute dealing with a subject in general and comprehensive terms, and another dealing with a part of the same subject in a more minute and definite way, the two should be read together and harmonized, if possible, with a view to giving effect to a consistent legislative policy; but, to the extent of any necessary repugnancy between them, the special statute, or the one dealing with the common subject matter in a minute way, will prevail over the general statute, according to the authorities on the question, unless it appears that the legislature intended to make the general act controlling[.]"

11. N.C. Gen. Stat § 105-267 was repealed by Session Laws 2007-491, effective 1 January 2008. Session Law 2007-491 instituted a new procedure by which a taxpayer may seek a refund of taxes paid. *See* N.C. Gen. Stat. § 105-241.7 (2009), *et seq.*

McIntyre v. McIntyre, 341 N.C. 629, 631, 461 S.E.2d 745, 747 (1995) (quoting Food Stores v. Board of Alcoholic Control, 268 N.C. 624, 628-29, 151 S.E.2d 582, 586 (1966)).

In sum, based on the clear and specific language of former N.C. Gen. Stat. § 105-267, we hold that the judgment entered "shall be collected as in other cases" and N.C. Gen. Stat. § 105-164.11 does not control in this case.[12] Consequently, CHEMC does not have to demonstrate that it has credited its customers prior to receiving the ordered refund.[13]

IV.

[4] Finally, NCDOR argues that the trial court incorrectly calculated the interest in its judgment. The trial court ordered NCDOR to pay interest at the legal rate for the entire period at issue, pre-judgment and post-judgment. CHEMC filed its complaint in 2000. As stated supra, at that time, N.C. Gen. Stat. § 105-267 allowed a taxpayer to bring a direct action against NCDOR in superior court, and, if the taxpayer prevailed, the statute required that the judgment be rendered therefor, with interest[.]"

N.C. Gen. Stat. § 105-241.21(a) (2009), which was enacted by Session Law 2007-491 and became effective 1 January 2008, provides that "[t]he interest rate set by the Secretary applies to interest that accrues on overpayments and assessments of tax." N.C. Gen. Stat. § 105-241.21(c)(2) states that "interest on an overpayment of a tax that is not included in subdivision (1) of this subsection accrues from a date that is 90 days after the date the tax was paid." NCDOR argues that N.C. Gen. Stat. § 105-241.21(a) and (c)(2) apply in this case since N.C. Gen. Stat. § 105-267 was repealed effective 1 January 2008, prior to the entry of judgment.[14] Specifically, NCDOR claims that the trial court "should have awarded interest against the Department: at the legal rate . . . but only from the dates of CHEMC's pre-2008 payments until January 1, 2008; and at the Secretary's rate . . . for all such . . . payments from January 1, 2008 to the present and for all post-2008 payments."

---

12. This holding is limited to cases brought pursuant to N.C. Gen. Stat. § 105-267.

13. CHEMC has explicitly represented to this Court that it will refund its customers once it is reimbursed by NCDOR in accordance with the judgment.

14. NCDOR references N.C. Gen. Stat. § 105-241.21(b)(2), which does not exist. Its argument clearly pertains to subsection (c)(2).

We hold that N.C. Gen. Stat. § 105-241.21(a) and (c)(2) are inapplicable in this case. CHEMC brought this action under then existing N.C. Gen. Stat. § 105-267, which provided for interest at the legal rate where the judgment rendered was pursuant to a determination that the tax levied was invalid.[15] N.C. Gen. Stat. § 105-267 controls, not N.C. Gen. Stat. § 105-241.21(a) and (c)(2), which were enacted after this action was instituted in the trial court. See Wilson v. Anderson, 232 N.C. 212, 219, 59 S.E.2d 836, 842 (1950) ( "Statutes are presumed to operate prospectively only."); Powell v. Haywood County, 15 N.C. App. 109, 111, 189 S.E.2d 785, 787 (1972) ("The tax assessment involved in this case was for the year 1970; therefore, the applicable statutes are those in existence prior to the extensive revision of Chapter 105 by the 1971 General Assembly.").[16] We recognize that Section 47 of Session Law 2007-491 states that "[t]he procedures for review of disputed tax matters enacted by this act apply to assessments of tax that are not final as of the effective date of this act and to claims for refund pending on or filed on or after the effective date of this act." CHEMC's requested refund was not pending before NCDOR on 1 January 2008. This matter was before the superior court pursuant to N.C. Gen. Stat. § 105-267. Consequently, we hold that the legal rate of interest applies to the entire judgment and the Secretary's rate does not apply to taxes paid by CHEMC after 1 January 2008 as NCDOR contends.[17]

## Conclusion

Based on the foregoing, we hold that the trial court did not err in holding that the Special Act was ambiguous and that the legislative

---

15. NCDOR does not argue that this "interest" is anything other than the "legal rate" of interest. "The legal rate of interest shall be eight percent (8%) per annum for such time as interest may accrue, and no more." N.C. Gen. Stat. § 24-1 (2009).

16. NCDOR does not argue that the interest calculated by the trial court for the period prior to 1 January 2008 was erroneous. The trial court applied the legal rate of interest beginning 1 April 2000. Still, we note that N.C. Gen. Stat. § 105-267 requires that the taxpayer wait 90 days after paying a tax under protest to bring an action in the superior court; however, the statute does not abate interest during that period. Former N.C. Gen. Stat. § 105-266(b) (2000) stated that overpayment of taxes to be refunded with interest "accrues from a date 90 days after the date the tax was originally paid by the taxpayer until the refund is paid[,]" but subsection (e) states that N.C. Gen. Stat. § 105-266 "does not apply to interest required under G.S. 105-267." Accordingly, the trial court correctly applied interest to the entire sum paid by CHEMC beginning 1 April 2000.

17. Again, this holding is limited to cases brought pursuant to N.C. Gen. Stat. § 105-267.

intent clearly establishes that CHEMC is a public agency with tax-favored status thereby excluding it from franchise and sales taxes. We further hold that the trial court erred in entering conclusion of law number 33 and a portion of conclusion of law number 32; however, neither error affects the outcome of this case. Additionally, we hold that pursuant to N.C. Gen. Stat. § 105-267 CHEMC is entitled to interest at the legal rate and need not refund its customers prior to satisfaction of the judgment.

Affirmed.

Judges HUNTER, Robert N., Jr. and WALKER concur.